## COSGROVE *v.* CITY COUNCIL OF AUGUSTA.

1. The City Council of Augusta has not, under the "general welfare clause" in the charter of that city, the power to pass an ordinance absolutely prohibiting drummers, runners, hackmen, cabmen, and all other persons from entering, with the owner's consent, a union passenger-depot in such city, "to solicit custom or patrons."
2. The question whether the owner in fee of such a depot, or its lessee, may or may not lawfully grant to one or more persons the privilege of entering the same for the purpose of soliciting "custom or patrons," to the exclusion of all others carrying on a like business, is not made in the present case.

Argued January 20,—Decided July 28, 1898.

Certiorari. Before Judge Callaway. Richmond superior court. April term, 1897.

Cosgrove was tried in the recorder's court of the City of Augusta, for the violation of an ordinance prescribing that "it shall not be lawful for any hotel or boarding-house drummer or runner, hackman, cabman, or for any other person, to solicit custom or patrons by entering the union passenger-depot in this city, or by standing at the entrance thereof; but such drummer, runner or hackman, cabman or other person, as aforesaid, may stand outside the wall of the depot, as hereinafter provided, and in a respectful manner solicit custom or patronage; provided that he or they shall not pull or otherwise annoy a passenger or passengers, or otherwise act in a disorderly man-

ner." From the evidence at the trial it appeared that the defendant went to a passenger in the union passenger-depot, who had just alighted from a train, solicited his custom, and conducted him to an omnibus of the Augusta Transfer Company, an incorporated company conducting the business of transferring baggage and passengers, and doing a general hack business, in the City of Augusta, of which company the defendant was an agent and employee, it being in the line of his duty to the company to solicit business of such passengers. It further appeared that the union passenger-depot had been leased by the Georgia Railroad & Banking Company, the owner in fee of the premises, to the Georgia Railroad Company for a term of years including the time when the act complained of occurred; and the president of the Augusta Transfer Company testified that his company had, by contract, and in consideration of its paying yearly a sum of money therefor, acquired the exclusive right, and had the exclusive permission of the Georgia Railroad Company, to solicit custom of the passengers or other persons within the union passenger-depot, and that the defendant was acting under this permission in doing the act complained of. The defendant was adjudged guilty, and a fine of $5 imposed upon him. On certiorari he assigned this judgment as error. The certiorari was overruled, and he excepted.

*Joseph B. & Bryan Cumming*, for plaintiff in error.
*M. P. Carroll, W. H. Davis* and *W. K. Miller*, contra.

FISH, J. 1. There is nothing in the charter of the City of Augusta delegating to its city council express power to regulate hacks or the hack business. The powers of the council in this respect are derived from the general welfare clause in the act of incorporation. It is elementary, that a municipal corporation in the exercise of police power conferred by the general welfare clause of its charter, for the purpose of promoting the comfort, health, convenience, good order, and safety of its citizens, may pass reasonable ordinances for the regulation of lawful trades and occupations within its limits. But it is not authorized under such power to make it unlawful to carry on a lawful trade or business in a lawful manner. There is quite a

difference between prohibition of a trade and the regulation of it. Indeed, "a power to regulate seems to imply the continued existence of that which is to be regulated." An ordinance which prescribes that certain persons shall not carry on their business, which would otherwise be legitimate, in a particular place, or on certain premises, is, as to such place, or premises, clearly prohibitive; and to authorize the passage of such an ordinance, where the power is undoubted, the injury to the public, which furnishes the justification for the ordinance, should proceed from the inherent character of the business when conducted at such place or upon such premises. Where, however, the business can be conducted there by proper persons without harm or inconvenience to the public, the prosecution of it should not be entirely prohibited, but such necessary police rules and regulations should be prescribed for carrying on such business in that particular locality as may be necessary for the public good. Corporation of Toronto v. Virgo, 73 L. T. Rep. 449. On appeal from the Supreme Court of Canada, the Privy Council held (affirming the judgment of the court below), that where a municipal council had power to make by-laws for "regulating and governing" hawkers, etc., they did not have power to prohibit hawkers from plying their trade at all in a substantial and important part of the city, and that a by-law to that effect was ultra vires; that when the legislature intended to give power to prevent or prohibit, it did so in express words, and that the provisions of the act did not intend to include a power to prevent or prohibit in a power to regulate or govern. It is stated in the opinion that it was argued that the by-law did not amount to prohibition, because hawkers might still carry on their business in certain streets of the city, but Lord Davey, speaking for the council, said: "The question is one of substance, and should be regarded from the point of view as well of the public as of the hawkers. The effect of the by-law is practically to deprive the residents of the most important part of the city of the power of buying their goods from, or trading with, the class of traders in question. . . At the same time the hawkers, etc., are excluded from exercising their trade in that part of the city."

As somewhat in point, see Dillon, Mun. Cor. (4th ed.) § 325; 17 Am. & Eng. Enc. L. 254, and notes; Tiedeman's Law of Pol. 289–290; Horr & Bemis, Mun. & Pol. Ord. § 30.  The case of Napman *v.* People, 19 Mich. 352, is very similar to the case at bar.  Napman was convicted before the recorder's court of the City of Detroit of violating an ordinance of that city, providing that, "No porter, runner, hackman, . . omnibus agent . . shall, on the arrival of any . . railroad-cars in the City of Detroit, for a period of fifteen minutes thereafter, go upon, or approach within twenty feet of, the . . depot where such . . railroad cars have . . stopped running, or are about to stop running, unless such porter, runner, hackman, . . omnibus agent, . . be requested by a passenger to remove some trunk or other baggage from said . . depot," etc.  The facts, as found by the recorder, were that, by an agreement between the Detroit & Milwaukee Railroad Company and the omnibus company, the drivers and agents of the latter, and they alone, were authorized and permitted to go within the depot of the former, immediately on the arrival of any train, to invite passengers to ride in their omnibuses.  Napman was a driver of the omnibus company, and as such, under the above agreement, within fifteen minutes after the arrival of a train at the Milwaukee depot, entered therein and solicited passengers to take one of the vehicles of his company. It was for this act he was convicted.  The Supreme Court, to which the case was carried by certiorari, directed that the conviction be quashed; and in the opinion says:  "The main question, however, calls for a decision upon the validity of a prohibition which would prevent railroad companies from making such arrangements as are found by the recorder to have been entered into here.  We have no difficulty in deciding that the city can not lawfully interfere to prohibit such arrangements.  The acts done are done upon the private premises of the railroad companies, over which the city can have no general control; and we think there is no reason why these companies, in their character of carriers of passengers, may not properly make such arrangements as will facilitate their reaching their destination anywhere in the city as well as at the end

of the track in the depot. Passengers who are strangers in the city have no means of knowing the character of the runners they may encounter outside of the depot; and if they can deal without confusion and at their leisure with responsible agents, it will be much more convenient and safe than to compel them to select from among strangers and in the noise and bustle attendant on the arrival of the cars. Such contracts of employment, made in the cars and on the premises by the companies, can not be lawfully restrained by the city authorities. No driver can without permission go, of right, on the private property of the railroad company, unless employed by a passenger, and the city could give him no authority to do so. And any arrangements for the delivery of passengers and their baggage—not unlawful in themselves—which are made by the railroads in their own cars, and on their own lands, are exempt from municipal interference; and the ordinances, so far as they may attempt such interference, are invalid."

This court held in *Fluker* v. *Georgia Railroad & Banking Co.*, 81 *Ga.* 461 (1), that "The dominion of a railroad corporation over its trains, tracks, and 'right of way' is no less complete or exclusive than that which every owner has over his own property. Hence, the corporation may exclude whom it pleases, when they come to transact their own private business with passengers or third persons, and admit whom it pleases, when they come to transact such business. This applies to selling lunches to, or soliciting orders from passengers for the sale of lunches." See cases cited at the end of first paragraph of the opinion, page 464. Also, Old Colony R. R. Co. *v.* Tripp, 147 Mass. 35; Griswold *v.* Webb, 40 Am. & Eng. R. R. Cases, 683; Perth Gen. Station Com. *v.* Ross, 8 Am. & Eng. R. R. Cas. 639, and cases cited in note. While it may be true that to permit all the hackmen in a city to go into the railroad-depots upon the arrival of trains, and, without rules regulating their conduct, allow them to offer their services and solicit patronage, would naturally create great confusion and bewilderment, and be very annoying, embarrassing, and harassing to passengers, yet the railroad company has the right to prevent this by excluding them all (see *Fluker's* case, supra), or by making such

rules and regulations as would obviate the evils.    See Cole *v.* Rowen, 13 L. R. A. 848; Kalamazoo Hack & Bus Co. *v.* Sootsma, 84 Mich. 192, 22 Am. St. Rep. 693.    If necessary, the municipality, by prescribing reasonable rules for the conduct of hackmen while plying their trade upon the premises of the railroad companies, could avoid the annoyance, etc., to which the public might otherwise be subjected.    As we have already seen, the dominion of a railroad company over its depot-grounds is no less complete and exclusive than that which any other owner has over his own property; and the corporation can admit or exclude whom it pleases, except when they may come to transact business with it as a common carrier. *Fluker's* case, supra.    Therefore the railroad company, if it should see fit, could keep all the hackmen out of its depot-grounds, if they did not come to transact business with it as a common carrier, or, if it pleased, it could admit them all upon its premises, unless legally deprived of such right by the city ordinance in question.    The right to permit hackmen to ply their trade upon its premises by there soliciting patronage is a valuable property right belonging to the railroad company, similar to its right to sell or lease to another the privilege of conducting a restaurant, news-stand, lunch-counter, storage-room for parcels, etc., in its depot, which, although its exercise may be regulated, can not be completely taken away by the municipality under the power granted it in the general welfare clause of its charter.    To do so would be to deprive the railroad company of its property without due process of law.    Moreover, the carrying on of a public hack business, not having any inherent evils, is lawful in itself; and where the privilege of soliciting custom for one's hack upon the premises of another, much frequented by the public needing hacks, has been secured from the owner of the premises, such privilege also becomes a valuable property right, of which the owner can not be entirely deprived by the city under the power granted in its general welfare clause.    Of course, the city under such power may regulate the exercise of the right by such reasonable rules as may be necessary for the comfort, convenience and safety of the public.

2. The question whether a railroad company can lawfully grant to one or more hackmen the exclusive privilege of entering its depot for the purpose of soliciting and obtaining patronage, is not made in this case. The only point presented by the writ of error is: Did the City of Augusta, under the power conferred by the general welfare clause of its charter, have the authority to pass the ordinance prohibiting all hackmen from entering the depot to solicit patronage therein, although the railroad company might consent for them to enter for such purpose? Whatever may be the rights, if any, of hackmen, who may have been excluded from the depot, they are not here complaining. The fact that the employer of the plaintiff may have secured from the railroad company the exclusive privilege of plying his trade in its depot can certainly shed no light upon the question as to whether or not the city, under its charter, could lawfully exclude all persons engaged in the same business from the depot. The question made is whether Cosgrove was rightfully there, and not whether others were wrongfully excluded.

*Judgment reversed. Simmons, C. J., and Little, J., dissented. The other Justices concurred.*